UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KATHLEEN KNEPPER,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No.17-cv-04838-VKD

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 22, 29

Plaintiff Kathleen Knepper appeals a final decision by defendant Nancy A. Berryhill ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423. The parties have filed cross-motions for summary judgment. Although given an opportunity to do so, Ms. Knepper did not file a reply brief. The matter was submitted without oral argument.

Upon consideration of the moving and responding papers, the relevant evidence of record, and for the reasons set forth below, Ms. Knepper's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order.[1]

## I.    STANDARD FOR DETERMINING DISABILITY

A claimant is considered disabled under the Act if she meets two requirements. First, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience. *Id.*, § 423(d)(2)(A).

In determining whether a claimant has a disability within the meaning of the Act, an administrative law judge ("ALJ") follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two.

At step two, the ALJ assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limits her ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c). If the claimant has a severe medically determinable physical or mental impairment that meets the duration requirements in 20 C.F.R. § 404.1509,[2] or a combination of impairments that is severe and meets the duration requirement, she is disabled. *Id.* § 404.1520(a)(4)(ii). Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). If so, a conclusive presumption of disability applies. If not, the analysis proceeds to step four.

At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform her past work despite her limitations. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform past work, then she is not disabled. If the claimant cannot perform her past work, then the evaluation proceeds to step five.

At the fifth and final step, the ALJ must determine whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience.

United States District Court
Northern District of California

---

[2] Section 404.1509 of the Code of Federal Regulations provides, "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."

20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled.

The claimant bears the burden of proof at steps one through four. The Commissioner has the burden at step five. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

The Social Security Administration has issued supplemental regulations that govern the evaluation of mental impairments at steps two and three of the sequential analysis. *Brown v. Berryhill*, No. 17-cv-02834-JCS, 2018 WL 4700348, at *9 (N.D. Cal., Sept. 29, 2018) (citing 20 C.F.R. § 404.1520a). Under those regulations, the Commissioner first determines whether the claimant has a medically determinable mental impairment. *Id*. (citing 20 C.F.R. § 404.1520a(b)(1)). "Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id*. (citing 20 C.F.R. § 404.1520a(b)(2), (c)). "Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1." *Id*. (citing 20 C.F.R. § 404.1520a(d)). "If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled." *Id*. (citing 20 C.F.R. § 404.1520(a)(4)(iii)). "Otherwise, the evaluation proceeds to step four of the general disability inquiry." *Id*. (citing 20 C.F.R. § 404.1520a(d)(3)).

## II.    BACKGROUND

Ms. Knepper was born in 1958 and was 58 years old at the time the ALJ issued the decision under consideration here. She completed the 11th grade in high school. The record reflects that she suffered sexual and emotional abuse, both as a child and as an adult, and that when she was 16 years old, Ms. Knepper was in a serious car accident in which the right side of her face and torso crashed through a windshield.

Ms. Knepper worked for nearly 40 years as a hairstylist and last worked in February 2014,[3]

[3] The record is inconsistent regarding the date Ms. Knepper ceased working. Ms. Knepper testified at the administrative hearing that she stopped working in 2012; in her application for disability insurance benefits, she stated that she stopped working on February 12, 2014. AR 42, 188. The Court will proceed with the February 2014 date identified in Ms. Knepper's application.

cutting hair at a salon.  She previously also performed office work at a storage facility.  AR[4] 225.

Ms. Knepper stopped working due to, among other things, interstitial cystitis, "a complex

genitourinary disorder resulting in recurring pain or discomfort in the bladder and pelvic region."

SSR 15-1P, 2015 WL 1292257, at *3; AR 45, 215.  The condition is characterized, "in part, as an

unpleasant sensation (pain, pressure, discomfort) perceived to be related to the urinary bladder,

associated with lower urinary tract symptoms of more than six weeks duration, in the absence of

infection or other identifiable causes."  SSR 15-1P, 2015 WL 1292257, at *3.  Interstitial cystitis

may be associated with other conditions, including fibromyalgia, chronic fatigue syndrome and

chronic headaches.  *Id*.

### A.  Administrative Proceedings

On July 22, 2014, Ms. Knepper filed an application for disability insurance benefits,

claiming that she was disabled beginning on February 12, 2014 due to a number of conditions,

including chronic interstitial cystitis, fibromyalgia, cervicalgia, chronic non-allergic sinusitis,

repetitive strain injury, depression and anxiety.  AR 188-191, 215.  Her application was denied

initially and upon reconsideration, and Ms. Knepper requested a hearing with an ALJ.

The ALJ held a hearing on November 18, 2015 and subsequently issued a decision,

concluding that Ms. Knepper is not disabled under the Act.  *Id*. at 20-29.  He found that Ms.

Knepper met the insured status requirements of the Act through June 30, 2019, her date last

insured.  At step one of the sequential analysis, he concluded that Ms. Knepper had not engaged in

substantial gainful activity since the alleged onset of disability, February 12, 2014.  *Id*. at 22.  At

step two, the ALJ determined that Ms. Knepper suffered from interstitial cystitis, which he found

to be a severe medically determinable impairment within the meaning of the regulations.  *Id*.

(citing 20 C.F.R. § 404.1520(c)).  However, he concluded that Ms. Knepper's "medically

determinable mental impairments of depression and anxiety, considered singly and in

combination, do not cause more than minimal limitation in [her] ability to perform basic mental

work activities and are therefore nonsevere."  *Id*. at 23.  At step three, the ALJ concluded that Ms.

---

[4] "AR" refers to the certified administrative record lodged with the Court.  Dkt. No. 12.

Knepper did not have an impairment listed in or medically equal to one listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id*. at 24 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). At step four, the ALJ found that Ms. Knepper has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she has certain postural and environmental limitations and would also require a work station that is no more than a 5-minute walk away from the nearest toilet facility. *Id*. at 25. He further found that Ms. Knepper is capable of performing past relevant work as a cosmetologist, receptionist, information clerk, data entry clerk and accounting clerk. *Id*. at 28. Accordingly, he concluded that she is not disabled and did not reach step 5 of the analysis.

The Appeals Council denied Ms. Knepper's request for review, and the ALJ's decision became the final decision of the Commissioner.

Ms. Knepper now seeks judicial review of that decision. She asserts that the ALJ erred in two main respects. First, she argues that the ALJ erred at step two of the sequential evaluation by failing to include her depression and anxiety among her severe impairments. Second, she argues that, in determining that she has the RFC to perform light work, the ALJ improperly discredited the opinions of her treating physicians and that of her therapist, instead giving great weight to the opinions of the examining and reviewing consulting physicians. Relatedly, Ms. Knepper contends that in assessing her RFC, the ALJ erred in discrediting her own allegations, as well as her mother's statement regarding her pain and functional limitations.

### B. Self-Reported and Third Party Evidence

#### 1. Ms. Knepper's Allegations

In a September 20, 2014 Adult Function Report, Ms. Knepper stated that her conditions cause chronic muscle and joint pain, exhaustion and severe fatigue. She stated that she can concentrate for only short periods of time, noting that she has insomnia and unrefreshing sleep and sometimes gets up every half hour to urinate. She further reported bladder pain; severe pain in her pelvic area and lower back; sensitivity to temperature; pressure in her face and neck; and susceptibility to bladder and sinus infections. She noted a worsening of her symptoms in the past two years. With respect to her daily activities, Ms. Knepper stated that "it depends on how I'm

5

feeling," adding that she does not have a routine because she feels different every day. She stated that on some days, she does not get out of bed, except to urinate. She said that she feeds her cats and cleans their litter box "when I can," but noted that her brother (with whom she lives) helps care for them. Ms. Knepper acknowledged that she can prepare simple foods, such as cereal or protein drinks, but stated that she cannot prepare meals that require cooking because she forgets things in the oven. She stated that she no longer goes out, due to urinary frequency and urgency, as well as depression and anxiety. She says she can no longer shop, attend family activities, garden, or do housework. Although she indicated that she is sometimes able to pay her bills, she also noted that she set up an auto-payment system because she has forgotten to pay her bills and was charged late fees. Depending on the weather, she can walk for about half a block before needing to rest. AR 246-255.

At the administrative hearing, Ms. Knepper testified that she stretches and does yoga to relieve the symptoms of fibromyalgia, but could not say how often she did so because "it just depends on how [she] feel[s]" and that it is hard for her to predict how she might feel from day to day. *Id*. at 50-51. She confirmed that she feeds her cats, but that her brother helps and that he is responsible for all of the cooking because she left plastic in the oven and left a stove burner on. She stated that she chooses not to drive due to the side effects of her medications (e.g., dizziness and drowsiness) and because she had an accident in a parking lot. Instead, her mother drives her to her doctor's appointments, and she also has help from her niece. *Id*. at 57-60.

### 2. Ms. Kotta's Statement

In a September 20, 2014 Third Party Function Report, Carmelita Kotta, Ms. Knepper's mother, reported that her daughter "is in constant pain," adding that Ms. Knepper's daily activities depend on how much sleep she gets, whether or not she wakes with a migraine and whether or not her bladder is inflamed. Ms. Kotta stated that Ms. Knepper feeds her cats and cleans their litter box, with her brother's help. She further noted that Ms. Knepper could no longer work, drive or do the gardening; can prepare cereal and protein shakes, but does not cook anymore; and is unable to do any household chores. Ms. Kotta stated that she takes Ms. Knepper once a week to see her doctors, pick up prescriptions and get groceries. Although Ms. Kotta indicated that Ms. Knepper

can count change, handle a savings account and use a checkbook/money orders, she noted that Ms. Knepper is unable to pay bills and instead uses an auto-pay system. Further, Ms. Kotta stated that Ms. Knepper watches television, and communicates with her family by telephone when she feels well enough, but otherwise does not have a social life or go out, except as necessary for doctor's appointments or to get prescriptions and groceries. In Ms. Kotta's view, Ms. Knepper's pain affects her memory, and limits her ability lift, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, use her hands, complete tasks, concentrate, follow instructions, and get along with others. Ms. Kotta remarked that Ms. Knepper can walk only one block before needing to rest; cannot pay attention for very long; may or may not be able to follow instructions or finish what she starts, depending on the instruction and the task at hand; does not handle stress well; and suffers from medication side effects, including blurred vision and drowsiness. *Id*. at 237-245.

### C.  Medical and Other Source Opinion Evidence[5]

#### 1.  Examining Psychologist Ilene Morrison, Ph.D.

Psychologist Ilene Morrison saw Ms. Knepper for a consultative examination on October 27, 2014. According to Ms. Knepper, the examination lasted about 10 minutes. *Id*. at 71. Ms. Knepper reported suffering from depression, anxiety, panic attacks and Post Traumatic Stress Disorder ("PTSD"), as well as fibromyalgia, interstitial cystitis, chronic headaches, chronic rhinitis and repetitive stress injury. Additionally, Ms. Knepper stated that she felt sad and had crying episodes off and on, experienced daytime fatigue, was socially isolated and suffered from appetite and sleep disturbance. Although she denied feelings of hopelessness, helplessness and worthlessness, Ms. Knepper stated that she was having trouble enjoying activities she once liked, such as gardening and cutting hair. She further stated that she lacked an appetite and that it was

---

[5] Ms. Knepper states that a December 15, 2016 report from her psychiatrist Dr. Helen Nunberg, M.D. was submitted to the Appeals Council, but was not made part of the record because the ALJ issued his decision on January 16, 2016, and the Appeals Council determined that Dr. Nunberg's report would not have affected the period at issue. Dkt. No. 22 at ECF p. 5 n.1. Ms. Knepper argues that Dr. Nunberg's report should have been made part of the record and goes on to provide what purports to be a summary of Dr. Nunberg's findings. The Commissioner does not respond at all about the Appeals Council's decision not to consider Dr. Nunberg's report. In any event, Ms. Knepper cites no procedure or authority permitting the Court to consider matters outside the record, or by which the Court itself may amend the administrative record. Accordingly, the Court has not considered Ms. Knepper's arguments about Dr. Nunberg's report.

"depression based." She also reported being diagnosed with anorexia in 2000 and stated that she continued to binge and starve herself. She stated that she was up all night due to pain and slept only two hours in the morning between 6:00 a.m. and 8:00 a.m. *Id*. at 408.

With respect to anxiety symptoms, Ms. Knepper reported racing thoughts, worry about finances, feelings of excessive worry and difficulty concentrating. For example, Ms. Knepper stated that she was disorganized and had trouble paying her bills. *Id*. She also acknowledged being psychiatrically hospitalized in the past and that she had received psychiatric treatment off and on throughout her life. *Id*. Dr. Morrison noted Ms. Knepper's current prescriptions for Wellbutrin, Lexapro, Ativan and Xanax, as well as Ms. Knepper's reported history of abusive relationships, both in childhood and as an adult.

In terms of her activities of daily living, Ms. Knepper reported the following: She lives in a home with her brother and can take care of her personal hygiene and dressing herself. Although she is able to go out alone, she chooses not to do so. Her outside activities include walking around outside her home "once in a while." *Id*. at 409. She has good relationships with family and friends. Additionally, Ms. Knepper reported no trouble with focus and attention, no difficulty completing household tasks, no difficulty making decisions, and the ability to pay her bills and handle cash appropriately. On a daily basis, Ms. Knepper said she could sometimes do household chores and cook simple foods. She is able to take her medications and is sometimes able to eat. Depending on how much sleep she gets, Ms. Knepper reported that her days consist of resting, attending doctor's appointments, watching television and looking up information about her conditions online. *Id*.

Dr. Morrison noted that Ms. Knepper appeared to be genuine and truthful, and she found no evidence of exaggeration or manipulation. The report reflects that Ms. Knepper's mood and affect were anxious, but her speech was normal, and her gait and gestures were unimpaired. Dr. Morrison found Ms. Knepper to be of average intelligence, and that she was alert and oriented to time, place, person and the purpose of the evaluation. Dr. Morrison observed that Ms. Knepper's thought processes were linear, with no evidence of hallucinations, delusions, or illusions. Ms. Knepper's abstract thinking was intact, as were her insight and judgment regarding her situation.

*Id.* at 409-410.

Dr. Morrison further observed that although she was anxious, Ms. Knepper was focused, concentrated well during the examination, and was able to contain her emotions during the neutral part of the testing, which was appropriate to the situation. *Id.* at 410. Dr. Morrison diagnosed Anxiety Disorder Not Otherwise Specified; Depressive Disorder Not Otherwise Specified; PTSD; and noted financial and unemployment Psycho Stressors during the past year. She also noted the need to rule out bulimia. Dr. Morrison further found that Ms. Knepper had a Global Assessment of Functioning of 55, and concluded that Ms. Knepper's prognosis was fair. *Id.*

In rendering her functional assessment, Dr. Morrison remarked:

> Although the claimant presented within [sic] minor problems with anxiety she was able to answer questions appropriate in today's evaluation. Yet, she reports having episodes of anxiety, depression and PTSD which have been debilitating. She appeared truthful in her statements. Thus, obtaining longitudinal history would be needed to support her statements. On my findings today she displays the following, however, if she experiences periods of decompensation then her functional abilities may become impaired.

*Id.* at 410-411. Dr. Morrison concluded that Ms. Knepper was mildly to moderately impaired in her ability to (1) do detailed and complex instructions and (2) carry out simple one or two step instructions in an eight-hour day, 40-hour workweek, without emotionally decompensating. However, Dr. Morrison found that Ms. Knepper otherwise had no impairment in her ability to understand, remember and carry out simple one or two step instructions; relate and interact with co-workers and the public; maintain concentration, attention, persistence and pace; perform day-today work activity, including attendance and safety; accept instructions from supervisors; maintain regular attendance in the work place and perform work activities on a consistent basis; and perform work activities without special or additional supervision. *Id.*

### 2. Examining Physician Dr. Clark Gable, M.D.

Ms. Knepper was also examined by consulting physician, Dr. Clark Gable, M.D., on October 27, 2014. According to Ms. Knepper, the examination lasted about 30 minutes. *Id.* at 69. Noting that this "is a complicated case with a multitude of complaints," Dr. Gable reported that Ms. Knepper's chief complaints were chronic sinusitis, fibromyalgia (first diagnosed in 1998, now

flaring), interstitial cystitis (diagnosed in 2008, now worse with chronic fatigue), depression and anxiety that have gotten much worse, irritable bowel, and anorexia. *Id.* at 412.

Based on his review of Ms. Knepper's medical records, Dr. Gable observed that her primary issues appeared to stem from her interstitial cystitis, for which nothing was found to help her, except pain medication. He noted that Ms. Knepper reported having a recent bladder instillation by her urologist, which did not help, and that she completed a course of antibiotics that did not alleviate the pain, most of which is in her lower abdomen. Dr. Gable also noted that Ms. Knepper reported that her fibromyalgia had been quiet for some time, but had begun to be a major issue, and that Ms. Knepper took pain medications as needed, including Gabapentin, Cyclobenzaprine and Vicodin. Dr. Gable further noted that Ms. Knepper complained of increased anxiety and depression, which, in turn, aggravated her fatigue and fibromyalgia. *Id.* at 412.

In conducting his examination, Dr. Gable observed that Ms. Knepper's grooming and personal hygiene were good and that she "walked from the waiting room into the exam room with no difficulty, got on and off the table with no problem and doesn't require an ambulatory device." *Id.* at 413. He found that her lower abdomen was moderately tender, with no palpable masses, no rebound, and normal bowel sounds. *Id.*

With respect to his musculoskeletal exam, Dr. Gable noted that Ms. Knepper had complained in the past of chronic cervical pain, although she acknowledged that x-rays had shown minimal abnormalities. Dr. Gable stated that Ms. Knepper "flexes 0 to 50, extends 0 to 50, and claims she can rotate only about 0 to 45 to the right and left," but noted that "there is no tenderness or spasm whatsoever." *Id.* at 413. He found her range of motion about the shoulders to be "relatively normal." *Id.* He found no pronator drift and noted that Ms. Knepper's "grip strength was 5/5." *Id.* Ms. Knepper was able to flex both knees through full range of motion without crepitus. Her straight leg raising was negative to about 60 degrees, and her gait was not antalgic. She was able to briefly walk on heels and toes, could anteroflex over 90 degrees, and could make a moderate squat. *Id.*

Dr. Gable found modest tenderness in Ms. Knepper's lumbar area, but noted that she was also tender from the neck down to the coccyx in the paraspinous muscles. All 18 pressure points

for fibromyalgia were positive. However, Dr. Gable remarked that Ms. Knepper was also tender in other areas not included for positivity for fibromyalgia, including the medial and lateral epicondyles, the pelvic outlet bones, the iliac crest, medial and lateral knees, the sacroiliac joints, the external and internal ankles (where there was no swelling) and up and down both shins. *Id.* at 413.

With respect to Ms. Knepper's functional capacity, Dr. Gable concluded:

> Based on the history and findings of today's examination, I think the claimant can sit up to 4 hours a day if properly medicated. I think she can stand and/or walk up to 4 hours a day. I don't think one can make a solid diagnosis of fibromyalgia since all other areas that were also tested were all positive. She's had significant psychiatric problems which have flared and gotten worse, which seem to have made her other symptomology worse. She does not need an ambulatory device. I think she can lift certainly 20 lbs. frequently and probably 40 lbs. occasionally—it is difficult to accurately determine based on the variable findings. I see no problem with fine finger and hand movements.

*Id.* at 414.

### 3. Nonexamining Physician A. Nasrabadi, M.D.

On November 18, 2014, nonexamining physician Dr. Nasrabadi issued a report, based on a review of Ms. Knepper's records, noting severe back impairments (discogenic and degenerative), anxiety disorders and affective disorders, as well as nonsevere disorders of the gastrointestinal system. Dr. Nasrabadi also found that Ms. Knepper had mild restrictions in her activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Nasrabadi found that Ms. Knepper credibly reported the existence of medically determinable impairments, but not the severity of her conditions. Dr. Nasrabadi concluded from review of Ms. Knepper's records that she could perform medium work with certain postural limitations, i.e., she could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, could stand/walk about six hours in an eight-hour day, could sit for about six hours in an eight-hour day, and could frequently kneel, crouch and crawl, but only occasionally climb ramps and stairs, climb ladders, ropes and scaffolds, and balance and stoop. Ms. Knepper was found to have no manipulative, visual, communicative, or environmental limitations. *Id.* at 103-105. Dr. A. Dipsia, M.D. affirmed Dr. Nasrabadi's findings on March 5, 2015. *Id.* at 118.

11

#### 4. Nonexamining Psychologist Kim Morris, Psy.D.

On November 19, 2014, nonexamining psychologist Dr. Kim Morris issued a report, based on a review of Ms. Knepper's records, finding that Ms. Knepper was moderately limited in her ability to understand and remember detailed instructions and in her ability to make simple work-related decisions. Dr. Morris concluded that Ms. Knepper was otherwise not significantly limited in the areas of memory and understanding, sustained concentration and pace, social interaction, and adaptation.. *Id*. at 106-108. Dr. Ida Hilliard, M.D. affirmed Dr. Morris' findings on March 19, 2015, noting that Ms. Knepper was capable of performing simple and complex tasks. *Id* at 118-119.

#### 5. Treating Physician Dr. Melinda White, D.O.

Dr. Melinda White has been Ms. Knepper's primary care physician since 2005. In 2015, Dr. White wrote two letters regarding Ms. Knepper's conditions, and also completed a Physical RFC Questionnaire and an Interstitial Cystitis Questionnaire on Ms. Knepper's behalf.

##### a. February 13, 2015 Letter

Noting that Ms. Knepper "has struggled with many physical and mental illnesses for many years," Dr. White stated that Ms. Knepper has chronic neck, arm and back pain, as well as headaches, that Dr. White believed were related to severe injuries Ms. Knepper sustained in her car accident. Dr. White further noted that Ms. Knepper has difficulty with repetitive motion using her arms, hands and fingers because such motion aggravates her chronic symptoms, and that Ms. Knepper's previous work as a hairdresser became impossible because of the pain it caused. Acknowledging Ms. Knepper's prior diagnosis of fibromyalgia, Dr. White stated that the pain "significantly limits her ability to move and function, and would interfere with her ability to work. S[h]e would have difficulty sitting, standing, lifting, carrying or bending for any significant amount of time." *Id*. at 313. Although Ms. Knepper was trying to increase her physical activity, Dr. White stated that "walking on flat ground for 20 minutes is challenging at this time." *Id*.

Dr. White also noted Ms. Knepper's interstitial cystitis, "which causes urinary frequency and pain." *Id*. While Ms. Knepper was seeing a urologist for treatment, Dr. White stated that the instillations Ms. Knepper had received were not significantly helpful. She also noted that Ms.

Knepper often has to urinate several times per hour and was chronically sleep deprived.

Additionally, Dr. White noted that Ms. Knepper requires several antibiotic prescriptions per year due to chronic sinusitis, but that medications only temporarily addressed her symptoms.

Finally, Dr. White noted Ms. Knepper's reported history of sexual and emotional abuse. Although Ms. Knepper was no longer in an abusive relationship, Dr. White opined that "the major depression, anxiety and post-traumatic stress this has created makes it difficult for her to function most days" and that "her symptoms severely affect her ability to think clearly, concentrate, learn new skills, manage complex tasks, interact socially and make decisions." *Id*.

While Dr. White stated that she was working with Ms. Knepper to stabilize her condition, she did not expect Ms. Knepper would "ever be stable enough to work to the extent that she would need to in order to be financially independent." *Id*. at 314.

### b. May 4, 2015 Letter

In this letter, which Dr. White wrote as an update to the one dated February 13, 2015, Dr. White noted Ms. Knepper's continued severe and constant pain in her right neck, upper back, and shoulder, with pain and numbness radiating into her right arm. The letter reflects that an MRI revealed spondylosis and moderately severe foraminal stenosis at C3/4, C5/6 and C6/7. Although Ms. Knepper was seeing physiatrist Dr. Matt Ryan for this pain, and received some relief from acupuncture and laser treatments, she reported that the relief was temporary. Additionally, Dr. White stated that repetitive motions exacerbated Ms. Knepper's symptoms:

> I believe her symptoms started after her car accident many years ago, when the right side of her face and upper torso crashed through a windshield at age 16. Her 40 years of hairdressing required lifting and holding her right arm up, which exacerbated her symptoms. She was able to maintain function with regular acupuncture treatments until she finally had to stop working in February 2014 due to a severe exacerbation of pain which correlated with an acute exacerbation of her depression.

*Id*. at 315. Further, Dr. White stated that intermittent bladder instillations for Ms. Knepper's interstitial cystitis provided only temporary and minimal relief from bladder pain and urinary frequency. As for depression, Dr. White reported that Ms. Knepper's condition was severe and that while Ms. Knepper was tolerating her multiple medications well, her symptoms were

"suboptimally controlled": "Pain and financial stress exacerbate the depression. The pain and depression distract her and keep her from thinking clearly." *Id*. In conclusion, Dr. White stated that Ms. Knepper "continues to be significantly disabled":

> Her pain inhibits her from sitting, standing or walking for more than a half hour at a time. She needs to lay down frequently to get relief during the day. Her pain and depression negatively affect her concentration, ability to focus and multi-task, and memory, to the point that she would have a difficult time performing any job for more than a few minutes at a time. There is no way she could focus to work even an hour straight without taking a break. She would not be able to perform any job regularly due to her constant pain, and she is not psychologically stable enough to train in any new capacity. She is following up with myself and specialists regularly, and taking her medication as prescribed. She is cooperative and wants to be well. However, I do not anticipate her multiple and severe issues will be improving in the near future. She will always battle with these diseases, even if we can get the current exacerbation under better control. This current exacerbation began in February 2014. I strongly believe she is an appropriate candidate for permanent disability benefits.

*Id*. at 316.

### c.    May 4, 2015 Physical RFC Questionnaire[6]

In a Physical RFC Questionnaire, Dr. White stated that Ms. Knepper's prognosis was fair and that her impairments were expected to last at least 12 months. She stated that Ms. Knepper was not a malingerer. Dr. White checked portions of the form indicating that Ms. Knepper's physical conditions were affected by psychological conditions of depression, anxiety and somatoform disorder. She further opined that the severity of Ms. Knepper's pain and other symptoms would constantly interfere with her attention and concentration needed to perform simple work tasks and that Ms. Knepper was incapable of performing even "low stress" jobs. With respect to Ms. Knepper's functional abilities, Dr. White stated that she could only sit for 20 minutes at a time; stand for 20 minutes at a time; rarely look down, turn her head right or left, look up, hold her head in a static position, twist, or climb stairs; and could never stoop, crouch or squat, or climb ladders. Dr. White also indicated significant limitations with handling or fingering,

---

[6] Dr. White's Physical RFC Questionnaire is undated. However, the Commissioner does not dispute Ms. Knepper's assertion that Dr. White completed this form on May 4, 2015.

stating that Ms. Knepper could use her right hand/fingers/arms only five percent of an eight-hour workday and her left hand/fingers/arms for 50 percent of an eight-hour workday for grasping, turning and twisting objects, fine finger manipulations and reaching.  Noting that Ms. Knepper would miss more than four days of work per month due to her impairments, Dr. White stated that Ms. Knepper was "easily overwhelmed" and that "severe depression [and] anxiety interfere with [her] ability to process and learn information, relate to others, manage stress."  *Id*. at 317-319.

### d. November 9, 2015 Interstitial Cystitis RFC Questionnaire[7]

Several months later, Dr. White completed an Interstitial Cystitis RFC Questionnaire, identifying Ms. Knepper's symptoms as follows:  urinary frequency, bladder/pelvic pain, thigh pain, urinary urgency, low back pain, nocturia with disrupted sleep, anxiety, depression, daytime drowsiness and lack of mental clarity and painful urination.  Dr. White also identified the following associated disorders:   inflammatory bowel disease, allergies, fibromyalgia, chronic fatigue syndrome, irritable bowel syndrome, endometriosis and vulvodynia.  Other identified diagnoses included cervical radiculopathy, chronic neck and back pain, anorexia nervosa, PTSD, headaches and sinusitis.  Dr. White opined that Ms. Knepper's prognosis was fair.  *Id*. at 495.

Dr. White indicated that Ms. Knepper's medications cause dizziness, drowsiness, fatigue, constipation and blurry vision.  She again wrote that Ms. Knepper's impairments could be expected to last at least twelve months; that Ms. Knepper was not a malingerer; and that her physical condition was affected by depression and anxiety, noting Ms. Knepper's history of sexual and emotional abuse.  *Id*. at 496.

With respect to Ms. Knepper's functional abilities, Dr. White checked the box on the form indicating that Ms. Knepper's symptoms were severe enough to constantly interfere with her attention and concentration needed to perform simple work tasks.  She further stated that Ms. Knepper needs to urinate every 30-60 minutes and is incapable of even "low stress" jobs, explaining that Ms. Knepper "cannot currently manage shopping, driving or cooking for herself. [H]as no capacity currently to manage any stress.  Symptoms have been severe x 3 years."  *Id*.  Dr.

---

[7] Although the ALJ appeared to attribute this Questionnaire to Dr. Newsome (AR 27), the record indicates that it was completed and signed by Dr. White (AR 498).

White noted that Ms. Knepper can walk only one or two city blocks without rest or pain; can sit only 15 minutes at a time; can stand only 20 minutes at a time; and can sit and stand or walk less than two hours in an eight-hour workday. Further, Dr. White indicated that Ms. Knepper required a job that permits shifting positions at will, ready access to a restroom, and unscheduled restroom breaks one to three times per hour for five minutes at a time. She checked boxes reflecting that Ms. Knepper can rarely lift and carry less than 10 pounds or climb stairs; and can never lift and carry more than 10 pounds; twist; stoop; crouch or squat; or climb ladders. *Id*. at 498.

Dr. White again noted that Ms. Knepper would miss more than four days of work per month due to her impairments, stating that Ms. Knepper also suffered from severe neck and head pain, with pain, weakness and numbness radiating to her right arm; had limited functioning of her right arm and hand; had severe environmental allergies; and was chronically distracted by pain and depression. *Id*.

### 6. Treating Physician Dr. Elizabeth Newsome, M.D.

Dr. Newsome is Ms. Knepper's urologist, and Ms. Knepper testified that she has been seeing Dr. Newsome since 2008. *Id*. at 68. The record contains a report of Ms. Knepper's March 11, 2015 visit to Dr. Newsome for treatment of her interstitial cystitis and pelvic pain. *Id*. at 481-486. In taking Ms. Knepper's history, Dr. Newsome noted that Ms. Knepper reported having to urinate every 30 to 60 minutes, day and night; disturbed sleep; chronic fatigue; and pain in her bladder, pelvic region, low back and thighs. *Id*. at 481. Dr. Newsome conducted a physical exam and found Ms. Knepper's general appearance normal and well developed, with no acute distress. A urinalysis "was completely negative. No white blood cells or bacteria seen." *Id*. at 482. Dr. Newsome's impression was that Ms. Knepper's symptoms were due to "[c]hronic interstitial cystitis," that she was "not doing well despite multi modal therapy," and that she has other chronic pain disorders, including fibromyalgia and irritable bowel syndrome. *Id*. Dr. Newsome performed a bladder instillation using Elmiron and lidocaine and recommended that Ms. Knepper have weekly instillations. She further noted that Ms. Knepper was "[s]eeking permanent disability, which seems reasonable." *Id*. at 482.

In a follow-up appointment in August 2015, Dr. Newsome again noted that a urinalysis

was negative and performed another bladder instillation. Her impression was that Ms. Knepper was not coping well due to her chronic interstitial cystitis, with poor pain control and sleep deprivation. *Id*. at 513-14.

### 7. Treating Therapist Cindy Brooks

Dr. White referred Ms. Knepper to Cindy Brooks, a licensed Marriage and Family Therapist ("MFT"), who began therapy with Ms. Knepper on April 16, 2015. After 31 therapy sessions, on November 10, 2015, Ms. Brooks wrote a report regarding Ms. Knepper's mental conditions and her treatment of them. On November 15, 2015, Ms. Brooks also completed a Mental RFC Questionnaire on Ms. Knepper's behalf.

### a. November 10, 2015 Report

Ms. Brooks stated that her intake screening of Ms. Knepper, which spanned five sessions, "revealed serious levels of depression and anxiety resulting from her loss of career/profession, the uncertainty of her future [i]ncome (since she had no other means of support), and the serious decline in her health which began in the spring of 2013." *Id*. at 558. Ms. Brooks also noted Ms. Knepper's "very extensive trauma history which has never been treated," as well as Ms. Knepper's reports of physical impairment, including pain, especially from interstitial cystitis, severe neck pain from arthritis in her cervical spine, severe daily headaches, frequent stomach aches, and sleep deprivation. *Id*. at 558-559. Additionally, Ms. Brooks stated that Ms. Knepper reported an inability to perform many normal activities of daily living due to poor cognitive functioning, exhaustion and chronic pain. Ms. Brooks wrote that Ms. Knepper stated that "[f]or most days each month she is in pain, not well enough to leave home, going out only to attend her medical appointments." *Id*. at 559.

With respect to her activities of daily living, Ms. Brooks wrote that Ms. Knepper reported as follows:

> She has family support for many activities of daily living, including cooking (she is not safe to use gas and electric appliances) and driving—her brother and mother have taken on these responsibilities. She takes care of payment of her bills, laundry and housekeeping, but she admits that she does not always perform these adequately. In the past few years she has found it difficult to establish and keep order in her home, something she was previously quite able to do. . ..

17

*Id.* at 559.

Based on her initial screening sessions, Ms. Brooks assessed Ms. Knepper with several psychological disorders relating to her medical illnesses and trauma history: anxiety disorder due to a number of medical conditions; depressive disorder due to a number of medical conditions; PTSD; major depressive disorder; panic disorder with agoraphobia; primary insomnia; and anorexia nervosa. *Id.* Ms. Brooks treated all of these conditions, except for anorexia nervosa, which she said she lacked the expertise to address.

Noting that Ms. Knepper's overall progress was slow, Dr. Brooks observed:

> Continuation of therapy twice a week is likely to help Ms. Knepper reduce her anxiety and depression and develop greater ego strength, although the expected time frame for this is uncertain. Whether the eventual mitigation of her anxiety and depression will contribute to significant remediation of her physical pain is also uncertain. It is possible that her physical illnesses may chronically limit her range of life activities. . . .

> With continued therapy and ongoing medication support, and barring further severe shocks or losses, I expect Ms. Knepper to make slow, more or less steady progress towards the above-listed goals.

> The work that I see ahead for Ms. Knepper will take time. Given her debilitating physical symptoms and her post-traumatic stress symptoms—including depression, suicidality, extreme agitation, even dissociation at times—it seems likely that she will experience significant impairment to her level of functioning for the foreseeable future.

*Id.* at 560-561.

### b. November 15, 2015 Mental RFC Questionnaire

In a Mental RFC Questionnaire, Ms. Brooks referred to her November 10 report and checked nearly every box on the form for Ms. Knepper's signs and symptoms, including: anhedonia; appetite disturbance; decreased energy; thoughts of suicide; flat affect; feelings of guilt or worthlessness; impaired impulse control; generalized persistent anxiety; somatization; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience which are a source of marked distress; persistent disturbance of mood or affect; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; hyperactivity; emotional lability; flight of ideas; deeply ingrained, maladaptive patterns of

18

behavior; easy distractability; memory impairment; sleep disturbance; recurrent severe panic attacks; and a history of multiple physical symptoms that have caused her to take medicine frequently, see a physician often and significantly alter life patterns; and persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the object, activity, or situation. Ms. Brooks also noted occasional incoherence and disorientation to time and place. *Id*. at 554-555.

With respect to mental abilities and aptitudes needed to do unskilled work, Ms. Brooks checked boxes indicating that Ms. Knepper is "[u]nable to meet competitive standards" for the following requirements: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precautions. *Id*. at 555. However, for the requirement of getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, Ms. Brooks checked boxes seeming to indicate that Ms. Knepper's abilities would range between "[s]eriously limited, but not precluded" and "[u]nable to meet competitive standards." *Id*.

For mental abilities and aptitudes needed to do semiskilled and skilled work, Ms. Brooks noted that Ms. Knepper is "[u]nable to meet competitive standards" for all of the listed requirements: understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; and deal with stress of semiskilled and skilled work. *Id*. at 556.

For mental abilities and aptitudes needed to do particular types of jobs, Ms. Brooks noted

19

that Ms. Knepper was "[s]eriously limited, but not precluded" from maintaining socially appropriate behavior. However, she otherwise checked boxes indicating that Ms. Knepper is "[u]nable to meet competitive standards" for the remaining requirements: interact appropriately with the general public; adhere to basic standards of neatness and cleanliness; travel in an unfamiliar place; and use public transportation. *Id*.

Ms. Brooks further noted that Ms. Knepper's psychiatric conditions exacerbated her pain and other physical symptoms; Ms. Knepper's impairments could be expected to last at least 12 months; Ms. Knepper would miss more than four days of work per month due to her impairments; and Ms. Knepper was not a malingerer. *Id*. at 557.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257*; Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

## IV. DISCUSSION

As discussed, Ms. Knepper contends that the ALJ erred in two main respects. First, she argues that the ALJ erred at step two of the sequential evaluation by failing to include her depression and anxiety among her severe impairments. Second, she argues that, in determining that she has the RFC to perform light work, the ALJ improperly discredited the opinions of Drs.

White and Newsome and therapist Ms. Brooks. Relatedly, Ms. Knepper contends that in assessing

her RFC, the ALJ erred in rejecting her mother's statement and her own statements regarding her

pain and functional limitations. The Commissioner maintains that the ALJ's decision is supported

by substantial evidence in the record and is free of legal error.

Because the resolution of the second issue raised by Ms. Knepper—i.e., whether the ALJ's

RFC determination at step four is supported by substantial evidence—informs the first issue

regarding the ALJ's step two analysis, the Court addresses the ALJ's RFC evaluation first.

### A.    The ALJ's Step Four RFC Evaluation

At step four of the sequential analysis, the ALJ determined that Ms. Knepper has the RFC

to perform light work, subject to certain limitations:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 C.F.R. § 404.1567(b) except the
> claimant can occasionally balance and crouch; never crawl; never
> operate a motor vehicle, and never have exposure to extreme heat or
> cold. In addition, the claimant must avoid exposure to unprotected
> heights. Furthermore, she would require a workstation that is not
> greater than a 5-minute walk away from the nearest toilet facility.

AR 25. In reaching that conclusion, the ALJ declined to give controlling weight to Dr. White's

opinion, and gave "little weight" to the opinions of Dr. Newsome and Ms. Brooks. Instead, he

gave "great weight" to the opinions of Dr. Gable, the consultative examining physician, and Dr.

Morrison, the consultative examining psychologist, and "partial weight" to the state agency

medical and psychological consultants who reviewed Ms. Knepper's records. Ms. Knepper argues

that the ALJ failed to articulate sufficient reasons, supported by substantial evidence, for

discounting the opinions of her treating physicians and therapist.

### 1.    Medical Sources[8]

"Cases in this circuit distinguish among the opinions of three types of physicians:

(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

claimant (examining physicians); and (3) those who neither examine nor treat the claimant

---

[8] Although the Commissioner's rules and regulations regarding the evaluation of medical evidence
were revised in 2017, both sides agree that those revisions do not apply to Ms. Knepper's claims,
which were filed before those revisions went into effect.

(nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id*.

A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). "However, '[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Social Security Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider several factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 404.1527(c)(6); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). The failure to consider these factors, by itself, constitutes reversible error. *Trevizo,* 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion. The legal standard that applies to the ALJ's proffered reasons depends on whether or not the treating physician's opinion is contradicted by another physician. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Trevizo*, 871 F.3d at 675. When a treating physician's opinion is contradicted by another physician, an ALJ

22

must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

Dr. White's and Dr. Newsome's opinions about the severity of Ms. Knepper's functional limitations are contradicted by the opinions of the consultative medical and psychological examiners and reviewers, who opined that Ms. Knepper retained the functional capacity to perform at least light or medium work. Thus, the ALJ was required to provide "specific and legitimate" reasons for discounting Dr. White's and Dr. Newsome's respective opinions, supported by substantial evidence. *Trevizo,* 871 F.3d at 675.

### a.    Dr. White

As discussed, Dr. White opined that, among other things, Ms. Knepper does not have the functional ability to perform even low-stress jobs, can sit or stand only up to 20 minutes at a time, would miss more than four days of work per month, and her pain and other symptoms would constantly interfere with her ability to perform even simple work tasks. AR 317-319, 496-498. Dr. White indicated that the alleged disabling symptoms and limitations existed since February 2014. *Id*. at 319. While acknowledging that Dr. White was Ms. Knepper's treating physician, the ALJ declined to give controlling weight to her opinions on three grounds. First, the ALJ stated, "Dr. White urges disability but never identifies a particular finding nor even asserts a disabling condition." *Id*. at 27. Additionally, the ALJ remarked that Dr. White attributed Ms. Knepper's conditions to her car accident, without a proper basis for doing so. Finally, he concluded that Dr. White's opinions are not well supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with her treatment notes and the other medical evidence of record. *Id*.

Although the ALJ found that Dr. White's opinion is not entitled to controlling weight, and indicated that he gives "such opinions partial weight," it is not clear from his decision what weight, if any, he did give to her opinion. His decision suggests that, due to what he considered a

"lapse in professional standards," the ALJ may not have given Dr. White's opinion any weight at all. AR 27. Even if a treating physician's opinion is not entitled to controlling weight, it may still be entitled to deference and adopted by the ALJ. *See* SSR 96-2P, 1996 WL 374188, at *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927."). The Court cannot tell from the decision what weight, if any, the ALJ gave Dr. White's opinion.

The Court considers each of the three reasons the ALJ gave for discounting Dr. White's opinion. First, despite the ALJ's assertion that Dr. White "never identifie[d] a particular finding nor even asserts a disabling condition," (AR 27), the record clearly shows that Dr. White stated that Ms. Knepper suffers from interstitial cystitis and opined that the condition is disabling. *Id*. at 313, 315, 495-498. Dr. White further noted that Ms. Knepper "continues to have severe and constant pain in her right neck, upper back, and shoulder, with radiation of pain and numbness into her right arm." *Id*. at 315. And while she posited that Ms. Knepper's symptoms may have started when she had her car accident, Dr. White did not attribute her impairments to the accident. Rather, she noted that repetitive movements required for Ms. Knepper's work as a hairdresser exacerbated her symptoms over time. Further, Dr. White appeared to base her statements about Ms. Knepper's neck, back, shoulder and arm pain, not on the car accident, but on an MRI that showed spondylosis and moderately severe foraminal stenosis at C3/4, C5/6 and C6/7. *Id*.

Second, with respect to the ALJ's finding that Dr. White's opinion is inconsistent with her treatment records, Ms. Knepper points out that the ALJ himself acknowledged Ms. Knepper's complaints of increased abdominal pain, as well as many of the objective findings and clinical signs of her impairments, including that a "physical examination found diffuse abdominal tenderness, muscle spasms in the cervical and upper back muscles, and multiple diffuse tender points to light touch in her knees, thighs, hips, arms, shoulders, neck, and back"; neck pain in May

2014; and multiple trips to the emergency room between May 2014 and June 2014 for dysuria with increased frequency, abdominal pain and abdominal distention, although a physical examination found no urinary retention. He further noted that laboratory findings were generally normal, "except for symptoms consistent with a urinary tract infection." *Id*. at 26. To the extent that the ALJ found unremarkable laboratory findings, Ms. Knepper argues, and the Commissioner does not appear to refute, that interstitial cystitis is a diagnosis of exclusion, based on symptoms, made only after ruling out other conditions. *See* SSR 15-1P, 2015 WL 1292257 at *4 ("The physician may make a diagnosis of [interstitial cystitis] based only on the person's reported symptoms, after examining the person and ruling out other diseases that could cause the symptoms."). While the ALJ remarked that "Dr. White confirms that imaging studies and laboratory findings are unremarkable," in the cited portion of Dr. White's records she acknowledges only that allergy testing and a CT scan of Ms. Knepper's sinuses were negative. AR 315, 449. The ALJ does not explain how these findings relate to Ms. Knepper's interstitial cystitis condition. Nor is it apparent that he gave any consideration to Dr. White's assessment of Ms. Knepper's mental impairments.

Third, the Commissioner contends that other medical evidence does not support the severity of the limiting effects of Ms. Knepper's symptoms on her functionality, as opined by Dr. White. For example, the ALJ observed that in his October 2014 consultative examination, Dr. Gable found normal range of motion, grip strength, and no neck pain. AR 27, 412-414. The Commissioner also points out that Dr. Gable found no shoulder tenderness or spasm, and only modest tenderness in the lumbar area. *Id*. at 413. Ms. Knepper, however, correctly notes that Dr. White's opinions are dated about a year after Dr. Gable's examination and that "[a] treating physician's most recent medical reports are highly probative." *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001); *see also Orn*, 495 F.3d at 633-34 (stating that the opinion of the plaintiff's treating physician had added significance due, in part, to the fact that it was the most recent report in the record).

The Commissioner nonetheless contends that other medical records support the ALJ's conclusion. Here, the Commissioner points to Dr. White's reports of two visits in 2014 that the

25

Commissioner says show no acute physical abnormalities, as well as emergency room records from May and June 2014 that indicate that Ms. Knepper's condition improved after receiving Norco. AR 369, 378, 386, 391, 393, 470, 479. While the ALJ cited to these records (or other portions of them) elsewhere in his decision, the Commissioner's regulations recognize that the "symptoms, signs, and laboratory findings of [interstitial cystitis] may fluctuate in frequency and severity and may continue over a period of months or years." SSR 15-1P, 2015 WL 1292257 at *5. Thus, evidence of a few instances where Ms. Knepper's symptoms may have been less severe or where she obtained some measure of relief is not necessarily inconsistent with Dr. White's opinion regarding Ms. Knepper's condition and the impact on her functionality. Moreover, while the ALJ could properly rely on other medical evidence in the record to assess the weight that should be given to Dr. White's opinion, it is not clear what other medical evidence, if any, the ALJ (as opposed to the Commissioner) relies on for his conclusion that Dr. White's opinion is inconsistent with the evidence of record. *See Bray*, 554 F.3d at 1225 ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). Indeed, other than to cite to Dr. White's opinion and to a single page from one of her treatment records, the ALJ did not specifically identify what "other medical evidence of record" he found inconsistent with Dr. White's opinion, his interpretation of that evidence, and what findings led him to his decision that Dr. White's opinion was not entitled to controlling weight.

More fundamentally, however, even if the Court infers that the ALJ considered the requisite factors under 20 C.F.R. § 404.1527(c), it is not clear how the ALJ ultimately weighed Dr. White's opinion. *See Powell v. Commissioner of Social Security*, Case No. 2:12-cv-12955, 2013 WL 3762954 at *10-11 (E.D. Mich. July 17, 2013) (remanding for determination of weight to be given treating physician's opinion). Given these uncertainties, and the fact that at least some of the ALJ's reasons for discounting Dr. White's opinion are not supported by substantial evidence, the Court grants Ms. Knepper's motion for summary judgment and denies the Commissioner's cross-motion.

### b.    Dr. Newsome

In a record of her March 11, 2015 examination of Ms. Knepper, treating urologist Dr. Newsome remarked that Ms. Knepper was "[s]eeking permanent disability, which seems reasonable." AR. 482.  The ALJ gave Dr. Newsome's opinion "little weight" because he found that she "seems to base this opinion primarily on the claimant's subjective reports regarding the claimant's past diagnoses rather than any [of] her own objective findings.  Therefore, the evidence does not provide any real support or analysis relating to why the claimant's cystitis should be disabling." *Id.* at 27.  Ms. Knepper reiterates that interstitial cystitis is a diagnosis of exclusion, arguing that Dr. Newsome properly took a history, recorded Ms. Knepper's subjective complaints, performed a physical examination and reviewed laboratory results before providing treatment.  However, Dr. Newsome did not provide any supporting reasoning for her remark, link it to any clinical findings, or even attempt to explain the basis for it.  The Court finds no error here.  *See Bray*, 554 F.3d at 1228 (stating that "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (internal quotations and citation omitted).  On this issue, Ms. Knepper's motion for summary judgment is denied and the Commissioner's cross-motion is granted.

### 2.    Therapist Brooks, MFT

As discussed above, in a November 2015 report and Mental RFC Questionnaire, Ms. Brook assessed Ms. Knepper with a mental RFC that precluded her ability to work, indicating that Ms. Knepper was "[u]nable to meet competitive standards" in nearly every category for mental abilities required to perform work activities.  AR 555-556.  Noting that Ms. Brooks is not an "acceptable medical source," the ALJ gave her opinion little weight because he found it was "not consistent with [Ms. Knepper]'s daily activities which includes gardening, exercising, and caring for pets."  AR 28.  He also concluded that Ms. Brooks' opinion was inconsistent with the findings of consultative examiner, Dr. Morrison, who opined that Ms. Knepper had no impairments in any category, except that she was mildly to moderately impaired in her ability to do detailed and complex instructions and to carry out simple one- or two-step instructions in an eight-hour day/40-hour work week, without emotionally decompensating.  *Id.* at 28, 411.

Only licensed physicians and certain other qualified specialists are considered "acceptable medical sources." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing 20 C.F.R. § 404.1513(a)). Therapists are not considered "acceptable medical sources" under the regulations that were in effect at the time the ALJ issued his decision. 20 C.F.R. § 404.1527 (regulation for "[e]valuating opinion evidence for claims filed before March 27, 2017"); SSR 06-03p (rescinded, effective March 27, 2017).[9] Instead, therapists are considered "other sources" whose opinions are not entitled to the same deference as "acceptable medical sources." *Molina*, 674 F.3d at 1111. "The ALJ may discount testimony from these 'other sources' if the ALJ gives reasons germane to each witness for doing so." *Id.* (quotations and citation omitted).

In discounting Ms. Brooks' opinion, the ALJ properly could consider Ms. Knepper's activities of daily living; however, the record indicates that she was more limited in those activities than the ALJ seems to suggest. At the administrative hearing, Ms. Knepper testified that her daily activities depend on how she feels on a given day, which is difficult to predict. AR 50. In her September 2014 Function Report, Ms. Knepper stated that she could no longer garden; that she has help with daily chores; and that she feeds her cats and keeps their litter box clean "when I can," noting that her brother "helps" and "feeds [and] keeps litter boxes clean." *Id.* at 247-248. While she acknowledged the ability to prepare simple foods, such as cereal, protein drinks and fruit smoothies, Ms. Knepper stated that she could not prepare meals that required cooking because she forgot things in the oven. *Id.* at 248. Although she indicated an ability to "sometimes" pay her bills, Ms. Knepper's report also noted that she established an auto-payment system because she was disorganized and "scattered" and had forgotten to pay her bills in the past. *Id.* at 249. Ms. Knepper's self-reported daily activities are not inconsistent with Dr. Morrison's report, which noted that "[o]n a daily basis the claimant can *sometimes* do household chores and cook simple foods," and that "*depending on how much sleep she gets* her days consist[] of resting, attending her doctor's appointments, watching TV, and looking up information [about her conditions] online." AR 409 (emphasis added). Ms. Brooks similarly noted that Ms. Knepper had

United States District Court
Northern District of California

---

[9] No one disputes that the regulations in effect at the time of the ALJ's decision apply to Ms. Knepper's claims.

family support for many activities of daily living, including cooking, because Ms. Knepper could not use gas and electric appliances safely. AR 559. While Ms. Knepper also told Ms. Brooks that she "takes care of payment of her bills, laundry and housekeeping," she also "admit[ted] that she does not always perform these adequately." *Id*.

The Commissioner points out that Dr. Morrison noted that Ms. Knepper had, at most, only mild to moderate impairments, and had no trouble with focus and attention, and no difficulty in completing household tasks and making decisions. Further, the Commissioner notes that Dr. Morrison found that Ms. Knepper was of average intelligence, and that her behavior was normal, her speech clear, her affect congruent, her thoughts linear and that she "focused and concentrated well." AR 409. Despite Ms. Knepper's anxious mood, Dr. Morrison also noted that she "was able to attend to tasks during the evaluation and she was able to contain her emotions during neutral material of the testing, which was appropriate to the situation." *Id*. In the Commissioner's view, this is not the description of an individual who is totally unable to follow simple instructions, make simple decisions, and get along with others without behavioral extremes.

Nevertheless, while noting that Ms. Knepper presented at the evaluation with "minor problems with anxiety," Dr. Morrison acknowledged that Ms. Knepper reported debilitating episodes of anxiety, depression and PTSD. *Id*. at 410-411. Further observing that Ms. Knepper "appeared truthful in her statements," Dr. Morrison remarked that a "longitudinal history would be needed to support her statements." *Id*. at 410-411. Here, Ms. Knepper points out that Ms. Brooks provided her functional assessment based on her observations and findings during the seven months that she had been treating Ms. Knepper, thus providing, in Ms. Knepper's view, the longitudinal history called for by Dr. Morrison. The Commissioner argues that Dr. Morrison's observations about the need for a longitudinal history are irrelevant, inasmuch as she based her functional assessment on her own testing and observations during her evaluation. However, Dr. Morrison emphasized that her assessment was limited to her one-time observation and testing of Ms. Knepper and available records. *Id*. at 411. She thus appeared to leave open the possibility that a longitudinal record might support Ms. Knepper's statements of debilitating mental impairments. For that reason, the Court does not agree that Ms. Brooks' opinions necessarily are

inconsistent with those of Dr. Morrison.

In sum, the ALJ did not provide germane reasons, supported by substantial evidence, for discounting the weight given to Ms. Brooks' opinion. On this issue, Ms. Knepper's motion for summary judgment is granted and the Commissioner's cross-motion is denied.

### 3. The ALJ's credibility determination

In evaluating her RFC, Ms. Knepper argues that the ALJ also erred in partially discrediting her allegations about her symptoms and functional limitations. The ALJ found that Ms. Knepper's allegations regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. *Id*. at 26.

An ALJ conducts a two-step analysis in assessing subjective testimony. First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996)). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear and convincing reasons for doing so.'" *Id*. (quoting *Smolen*, 80 F.3d at 1283-84). That is, the ALJ must "make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Trevizo*, 871 F.3d at 678 (quotations and citation omitted).

An ALJ may consider several factors, including (1) ordinary techniques of credibility evaluation; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Tommasetti*, 533 F.3d at 1039. Additionally, an ALJ may also consider the observations of treating and examining physicians and other third parties concerning the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Smolen*, 80 F.3d at 1284. "Although lack of medical evidence cannot form the

sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 681. "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas*, 278 F.3d at 959).

Here, the ALJ found that Ms. Knepper's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but concluded that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. . . ." AR 26. The ALJ made no finding of malingering and therefore was required to provide specific, clear and convincing reasons for discounting Ms. Knepper's statements regarding her symptoms. *Tommasetti*, 533 F.3d at 1039. The ALJ explained:

> The claimant's activities of daily living, work history, and the objective medical evidence do not support her allegations of disabling pain and symptoms. The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. As noted above, the claimant reports that she can [sic] some housework, shop, prepare light meals, care for her cats, and gardening. The claimant also does Yoga regularly for pain relief. Such activities suggest that the claimant has engaged in a somewhat normal level of daily activity and interaction. The physical and mental capabilities requisite to performing many of the tasks described above as well as the social interactions replicate those necessary for obtaining and maintaining employment.

AR 26. The ALJ went on to state:

> Furthermore, the objective evidence does not support her claims because the severity of her reported symptoms do not match the objective medical evidence. Although the claimant has received treatment multiple times from emergency services, . . . the exams and results obtained during these visits are consistently normal except for a recurrent UTI (Ex. 3F, pg. 2). Further despite her complaints of neck and back pain, the claimant [sic] tests consistently show no neck tenderness and full range of motion. She walked without an assistive device and had full grip strength (Ex. 5F, pg. 2). There is no active diagnosis of fibromyalgia despite the claimant's diagnosis, which was reportedly made in 1998. Such findings are not consistent with complaints of disabling pain. However, based upon the claimant's allegations and upon her testimony and appearance at the hearing, the undersigned finds that the claimant is partially credible and is therefore limited to light work with additional postural and environmental restrictions. These limitations account for the claimant's alleged need to urinate frequently, inability to drive due to pain, and difficulties with dizziness.

AR 26-27.

If, despite claims of pain, "a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). At the same time, the "Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits," and "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id*. And merely because a disability plaintiff carries on certain daily activities "does not in any way detract from her credibility as to her overall disability." *Orn*, 495 F.3d at 639 (citation omitted). Thus, "[t]he ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (quoting *Burch*, 400 F.3d at 681).

In the present case, and as discussed above, the record indicates that while Ms. Knepper acknowledged engaging in certain activities, such as yoga to relieve her fibromyalgia symptoms and caring for her cats, there is no indication that she engaged in these activities with any regularity. Nor is there any explanation or evidence to support that the identified activities are transferable to a work setting, or that Ms. Knepper spent a substantial part of her day engaged in transferable skills. Indeed, Ms. Knepper's testimony and statements to Dr. Morrison and Ms. Brooks suggests that her activities depended on how she felt on a given day, which was difficult to predict. AR 50, 409, 559. Although the Commissioner points to Ms. Knepper's hearing testimony in which she seems to confirm that she was "solely responsible" for her cats, she went on to clarify that although they were her cats, her brother helps care for them. *Id*. at 57. Accordingly, the mere fact that Ms. Knepper sometimes carried on these activities does not constitute substantial evidence to support the ALJ's decision to discount her statements as to the severity of her symptoms. *Orn*, 495 F.3d at 639; *Fair*, 885 F.2d at 603.

The only other reason offered by the ALJ for partially discrediting Ms. Knepper's credibility is that her claims were not supported by objective medical evidence. Standing alone, however, lack of medical evidence cannot form the sole basis for discounting credibility. *Burch*,

400 F.3d at 681.  Accordingly, the Court finds that the ALJ failed to provide sufficiently specific, clear and convincing reasons for partially discrediting Ms. Knepper's credibility.

On this issue Ms. Knepper's motion for summary judgment is granted, and the Commissioner's cross-motion is denied.

### 4. Ms. Kotta's Third Party Statement

As discussed, Ms. Kotta reported that her daughter "is in constant pain," adding that Ms. Knepper's daily activities depend on how much sleep she gets, whether or not she wakes with a migraine and whether or not her bladder is inflamed.  She further noted that Ms. Knepper's pain affects her memory, and limits her ability lift, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, use her hands, complete tasks, concentrate, follow instructions, and get along with others.  Ms. Kotta remarked that Ms. Knepper can walk only one block before needing to rest; cannot pay attention for very long; may or may not be able to follow instructions or finish what she starts, depending on the instruction and the task at hand; does not handle stress well; and suffers from medication side effects, including blurred vision and drowsiness.  AR 237-245.

The ALJ only gave Ms. Kotta's statement "some weight" because he found that her statements were inconsistent with the objective medical evidence; that she lacked the requisite medical training to make "exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms"; and because she possibly was biased by virtue of her familial relationship with Ms. Knepper.  AR 28.

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account."  *Molina*, 674 F.3d at 1114; *see also Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("Such testimony is competent evidence and *cannot* be disregarded without comment.") (internal quotations and citation omitted).  "If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons 'that are germane to each witness.'"  *Bruce*, 557 F.3d at 1115 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)).  "Further, the reasons 'germane to each witness' must be specific."  *Id*. (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006)).

The ALJ failed to articulate germane reasons for discounting the weight given to Ms.

Kotta's statement. First, in the Ninth Circuit, an ALJ may not discredit lay testimony as unsupported by medical evidence in the record. *Bruce*, 557 F.3d at 1116 (citing *Smolen*, 80 F.3d at 1289). Second, "[t]he fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony." *Smolen*, 80 F.3d at 1289. As explained in *Smolen*, to do so "amount[s] to a wholesale dismissal of the testimony of all witnesses as a group" since "the same could be said of any family member who testified in any case." *Id.* Rather, the value of lay witness testimony inheres in the witnesses' familiarity and observation of the claimant; and such witnesses often will be family members. *Id.* For these same reasons, the Court concludes that the ALJ cannot properly discount Ms. Kotta's statement on the ground that she is a non-medical source.

On this issue, Ms. Knepper's motion for summary judgment is granted, and the Commissioner's cross-motion is denied.

### B. The ALJ's Step 2 Impairment Analysis

As discussed, the ALJ concluded that Ms. Knepper suffered from only one severe impairment: interstitial cystitis. While he found that Ms. Knepper did have medically determinable impairments of depression and anxiety, he concluded that these were not severe conditions. And with respect to the four broad functional categories, he found that Ms. Knepper was only mildly limited in her concentration, persistence and pace, but was otherwise not limited in her activities of daily living or social functioning, and that she had no episodes of decompensation that were of extended duration. AR 23. Ms. Knepper argues that the record as a whole reflects moderate to severe limitations in her ability to perform a myriad of work-related mental activities, and that the ALJ mischaracterized or failed to consider evidence indicating that Ms. Knepper's mental impairments were "severe" within the meaning of the Social Security regulations.

As discussed, at step two of the sequential analysis, the ALJ considers whether a claimant suffers from a "severe" impairment, or combination of impairments. 20 C.F.R. § 404.1520. In practice, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. A severe impairment is one that significantly limits a claimant's

34

physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work. *Smolen*, 80 F.3d at 1290 (internal quotations and citation omitted). If a severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis, regardless of whether any such impairment, if considered separately, would be of sufficient severity. 20 C.F.R. § 404.1523; *Smolen*, 80 F.3d at 1290 (the ALJ "must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone [i]s sufficiently severe."). If the ALJ erroneously determines that an alleged impairment is not "severe," at step two, the reviewing court must determine whether the error was harmless. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.2007); *Burch*, 400 F.3d at 679.

The Commissioner correctly notes that the step two analysis "is not meant to identify the impairments that should be taken into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017). Indeed, in evaluating a claimant's RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." *Id*. at 1049. "The RFC therefore *should* be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id*. Thus, the Commissioner argues that the relevant question is not whether the ALJ should have found a severe mental impairment, but whether his RFC determination is supported by substantial evidence.

The ALJ ultimately resolved the analysis at step two in Ms. Knepper's favor by finding that she did have a severe impairment and by proceeding with the remainder of the sequential analysis. The Commissioner contends that any error at step two is harmless because the vocational expert testified that even if Ms. Knepper's RFC was further limited to simple, repetitive tasks and only occasional interpersonal interactions, there still are other jobs that she could perform. AR 84. However, Ms. Knepper correctly points out that when functional limitations identified by Ms. Brooks were included in hypotheticals to the vocational expert, the vocational expert indicated that such an individual would not be able to perform Ms. Knepper's past work or any other work. *Id*. at 91-93. For the reasons discussed above, the ALJ failed to state what weight

35

he gave to Dr. White's opinion or to support his analysis with substantial evidence, and did not properly assess Ms. Brooks' opinion, or Ms. Knepper's and Ms. Kotta's statements as to Ms. Knepper's functional abilities—all of which could materially affect Ms. Knepper's final disability determination. The Court does not find harmless error here.

On this issue, Ms. Knepper's motion for summary judgment is granted and the Commissioner's cross-motion is denied.

## V. DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106.

The Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made . . . . and whether further administrative proceedings would be useful.'" *Id.* (quoting *Treichler*, 775 F.3d at 1101). "When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101). Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id.* at 1045. As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Id.* at 1044.

In the present case, the first condition is met because the Court has found that the ALJ

36

failed to state what weight he gave to Dr. White's opinion or to support his analysis with substantial evidence and failed to provide legally sufficient reasons for giving little weight to Ms. Brooks' opinion and for discounting Ms. Knepper's and Ms. Kotta's statements as to Ms. Knepper's symptoms and functional limitations. However, there are outstanding issues that must be resolved before a final determination can be made. The ALJ must reassess Ms. Knepper's statements and those of Ms. Brooks and Ms. Kotta and provide legally adequate reasons for any portion of those opinions or statements that the ALJ discounts or rejects. The ALJ must also explain the weight, if any, he gives to Dr. White's opinion, supported by substantial evidence.

## VI. CONCLUSION

Based on the foregoing, Ms. Knepper's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order. The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated:  March 31, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge